Florida, Inc. v. Secretary, Florida Agency for Health Care Administration All right. We'll hear first from Mr. Baum. Good morning, Your Honors, and may it please the Court. Christopher Baum for ACCA. More than 20 years ago, Congress changed the formula for reimbursing federally qualified health centers for treating Medicaid patients. Instead of a reimbursement system based on a center's yearly reasonable costs, Congress implemented a prospective payment system. Payments are calculated as follows. Take the average per-visit costs under the previous system, which was based on reasonable costs, and then adjust based for, one, the change in the Medicare Economic Index, which is a measure of inflation for physicians based on a bundle of inputs, and, two, a change for any increase or decrease in the scope of such services provided by the center. Now, ACCA, the agency responsible in Florida for administering Medicaid, has defined increase or decrease in such services as the addition or subtraction of a service. In other words, at a service, the scope of services has changed. At what level of generality are we defining service? So, for instance, if a hospital adds an entirely new department, we didn't have cardiology before, now we do. Easy. But, like, within, say, oncology, we didn't used to do this type of chemo, now we do. Is that, under your understanding, your sort of across-service understanding, is that adding a new service? So, I've looked into this, and the level of generality at which service is defined is a tricky question. But, ultimately, it's not an issue in this case, because plaintiffs didn't say, you know, we added this service, and, you know, maybe at the level of generality that differed from what ACCA was considering. And ACCA did not give us a reimbursement for that. That's not what they're saying. What they're saying is, well, the amount, the duration, and the intensity of our services that we do provide has changed. And so, it would be a very different case if they were taking issue with ACCA's definition of service and saying, you know, we added, you know, this particular procedure, but you didn't allow us an additional reimbursement for that. Well, I guess the reason I ask is that, as I understand their sort of the frame, their framing of their own claim, they talk about sort of four buckets, type, duration, amount, intensity, right? So, your primary beef is with duration, amount, intensity, as I understand it. Type seems like it might fit your definition of scope. That's right, Your Honor. But so still I wonder where type begins and ends. Is it sort of like a department by department, or is it within a department? I don't want to use the freighted terminology of the – I don't want to say service. That's what I'm trying not to do is to say service, but the same sort of like thing, appointment, or whatever. It's hard to define, Your Honor, and I was talking with folks in the agency just yesterday about this. And generally speaking, it's divided into broader buckets like optometry, which was the service that they requested a reimbursement for here and that they were granted, or podiatry, or psychology. So generally speaking, centers ask for it in a more broad range. But it is certainly possible that within ACCA's definition there could be a – based on this particular claim code that's reimbursable under Medicaid. Interesting. So that's what I was going to ask you is might it be tied to claim codes? It could be, Your Honor, but it's unclear, and that question is certainly not presented here because they are asking for reimbursements based on changes to amount, duration, intensity, et cetera. And they are not saying, well, we added this particular claim code and ACCA denied a reimbursement based on that particular amount. Okay, so can I ask you another one? And then I promise I'll shut up and let you talk or let my co-panelists ask their questions. So as to amount and duration, totally understand your argument. I find it pretty persuasive, frankly, the fact that the statute uses scope, amount, and duration clearly to mean different things. What does intensity even mean? I'm not sure, Your Honor, and it's not in the statute. Yeah, I know. So it's hard to see where they're getting intensity. And you wouldn't say it changed – Well, I think they're getting it from the CMS guidance document. That's certainly possible, Your Honor. But nobody really relies on that, and I didn't even really know it existed until I went, I think, and read the district court opinion having read the briefs and, oh, there's this CMS guidance document, and it uses the same phraseology that they're using to frame their claim here. So I think that's where they get it. I just don't think I know what it means and how it fits into the taxonomy that I'm trying to get from the statute. Sure, Your Honor. And I don't think that you would naturally use the word scope to encompass the concept of intensity. But I would say that what they're asking for, if you look at their complaint and you see what are they asking for when they're saying that the intensity of their services have changed. Now, they ask for a change based on more clinician encounters, longer clinician encounters. So their intensity actually does encompass both amount and duration, but it also encompasses things that are covered by the Medicare Economic Index. So, for example, additional non-medical assistance, the addition of a computer system, addition of new equipment. Now, that's all covered by changes to the Medicare Economic Index. So their definition of intensity covers concepts that are covered either by amount or duration or are covered by the Medicare Economic Index. Now, the only thing that's not is I would say that they say, well, there's a change in the mix of the patient population. But that can't be a change that's reimbursable under this particular formula. No one would say, well, you know, last year we had nine patients who had a broken leg and one patient who had optometry. This year it's the other way around, and the scope of services that we provide has changed. You wouldn't use scope in that manner. But more importantly, it would be impossible to calculate the change, how much to reimburse a center based on a change in the patient population without going back to a calculation of reasonable cost. You could not look to, you know, for example, well, the patient population has changed, and so our costs have increased because the treatments are more intense, et cetera. Well, how do you calculate that? You go back to reasonable cost. But that's exactly what Congress went away from. They said we're not doing this anymore. We're relieving the centers of the burden to submit their reasonable costs. We're relieving the agencies of the burden of assessing whether those are reasonable costs. So Your Honor has discussed the plain language argument. We think that, you know, the 15 to 1 disparity in terms of the use of amount and duration next to the word scope is informative. The definition of scope that the agency has adopted is well within the dictionary definition. The range of such services, for example. Your position isn't that scope has to mean range. It's that scope could mean range, and the context of the statute sort of disambiguates the term, and we know from the larger context and from cross-references that it must mean range at a type level. That's right, Your Honor. I just wanted to make sure that I had your argument. Absolutely. Let me ask you this. What if we disagree and think that the statute's ambiguous? I assume your argument is that Chevron deference is owed to the agency's decision to approve your plan. I mean, does that have the force of law that the agency went ahead and approved your plan three times? I think we have a much tougher argument if the court concludes that, you know, it cannot resolve the definition of the word scope using the traditional tools of statutory interpretation here. You know, on the one hand, you have the CMS guidance, which is nonbinding. We don't think it's entitled to much Chevron deference. Of course, we didn't brief this issue. But on the other hand, in the mix of, you know— It probably isn't entitled to Chevron deference, but it may be entitled to Skidmore. Skidmore, sure. Right? Sure. But we think that, you know, on the other hand, you also have CMS having approved Florida's definition several times, and I think that the court would take that into account as well under the Skidmore analysis. So the CMS evidence is, like, all over the place, right? Exactly, Your Honor. But the statute just makes it clear that ACCA's definition is the only one that can be the right one. Can you explain the double-dipping argument that you make? And is that argument really more a public policy argument, or does it really go to the interpretation? Because it could be the interpretation doesn't favor you, but the outcome of the interpretation is harmful economically to the state. I think, Your Honor, it goes to the interpretation because Congress would not have adopted a formula that would allow for this type of double-dipping. So, for example, if a change in amount were allowed, amount is just, as they define it, you know, number of visits, but they get a per visit reimbursement. So if the amount of visits go up, they already get more reimbursements. So it wouldn't make sense. Per visit, but if they're giving new or different services that would require another visit, how is that double-dipping? Because if there was another visit, they would get another reimbursement. But another reimbursement for another type of service. For another visit. So the amount that they are reimbursed for at every visit is the same, no matter what services are received during any particular visit. Right. But my understanding is that you had an issue with the type of services, the expansion of services, within the scope of a particular treatment that's given. And if you have a patient who's receiving more services that would require more visits, why is that problematic? Because every time that there's a visit, they get a reimbursement. And so to increase the reimbursement amount based on the fact that there are more visits would be double-dipping by definition. And with duration, duration, you know, longer clinician encounters, for example, changes to that are accounted for by changes in the Medicare Economic Index because that bundle of inputs includes things such as a physician's own time. And so Congress would not have intended to create a formula that would allow for double-dipping of reimbursements when it's trying to protect the overall funds available for Medicaid. So your point is that to the extent that they're seeking reimbursement on an amount basis, that double-dips factor one, what I'll call it, like the sort of the per patient per visit formula. Yes, Your Honor. The extent they're seeking reimbursements for durational increases, that is accounted for in factor two, the inflationary index. Yes, Your Honor. And it's also possible to read their definition of duration and what they're asking for in their complaint as also including more clinician encounters. So, for example, amount. So, yes, both of those concepts are accounted for. Now, I think it's important to understand that you can't calculate the changes that they are asking for ACCA to take into account when calculating the reimbursement without actually going back and looking to what the reasonable costs were. How do you calculate the changes that they're talking about? You would have to go to their individual reasonable costs, and that's exactly what Congress decided to stop doing. Now, I see that I'm into my rebuttal time, so I will reserve the remainder of my time. All right. Thank you, counsel. We'll hear from Mr. Bookman. May it please the Court. Lloyd Bookman on behalf of the Appellee Family Health Centers of Southwest Florida. Would you respond to my double-dipping question? I guess I'm just trying to understand what the problem is there. So, what's your understanding? My understanding is the only double-dip that would occur is if we were just seeking an adjustment solely because we added more visits of a particular type. So, if we had more pediatric visits and we said, ask more money, increase our rate because we had more pediatric visits, that could be viewed as inconsistent with the payment methodology, which is on a per-visit basis. Understand that. But there's no double-dip when the argument is, well, we've had a scope change. We've added a service. We've added a new center, a new facility. We've increased the scope of our practices from 13 practices in 2000 to 41 when we filed the complaint in 2021. And that increase in the number of sites and the number of practices in those sites in and of itself causes a justifiable increase in our costs. That's not a double-dip. So, we disagree, obviously. Again, if we were only asking for more money because we had more visits, I agree with them. So, I guess the argument on the other side that your friend is making over here is that it is a double-dip because when you add more doctors and more practices, then you're recouping your investment by having more visits and getting paid for more visits. What would your thoughts be on that? If it's just the more doctors and the greater practices, which we think is a ground for a scope of services adjustment, I want to make that clear, it's not a double-dip because we're being paid based on a cost basis from 1999 and 2000. So, as we add more practices, which I think is within the plain meaning of a scope of services, and I'll get to that in a moment, as we add more practices, we have to pay people at today's rates. If I had a practice today, I can't pay them at 1999 and 2000 rates, even increased by the inflation factor. But that just sounds like an argument that you don't like the way the statute operates. It's sort of like it's unfair to your business model, and that may be right. I think I sort of understand why you hate the operation of this statute and the state's interpretation of this statute because you just think like you're going to pile up shortfall after shortfall after shortfall, frankly, as like the baby boomers get old and live long and are sick. But that really doesn't answer the interpretive question. It just says like this is bad for us. No, it is bad, but that's not my textual point at all, Your Honor. Let me go here. The statute says you have to get an adjustment. It's required to make an adjustment for a change in scope of service granted. The question is what do those words mean? Congress was absolutely clear when it enacted this prospective payment system. It did not intend to hurt federally qualified health centers. As we discussed in our briefs, Congress intends very much to protect federally qualified health centers as the providers to low-income populations, to underserved populations. See, I think that may be right, but this is why like sort of appeals to sort of subtextual intent and purpose sort of drive me nuts because I think that he's just going to say, no, no, no, Congress's intent here in moving away from a reasonable cost model to this model was to like control costs and incentivize hospitals to control costs. So like everybody's got a great purpose argument, and so it just seems like we ought to focus on what Congress actually did. And I disagree with part of what you just said, Your Honor. Congress did not enact this prospective payment system to control costs. It did for hospitals. When it went to a DRG system back in 1983, sure. And the clearest intent we have is Judge Grassley's statement, which is we're doing this to ensure federally qualified health centers have enough money to survive. We don't want them to shut their doors. Because wasn't there a situation where they did actually start to take money away and then they realized that that was causing a problem? So that's when Senator Grassley made the statement. That's exactly true, Your Honor. And then they built in the scope of services safety valve. That's the safety valve because Congress knew that freezing something based on what happened in 2000, even increased by inflation, isn't going to account for a myriad of things that could change. So it used a pretty broad terminology. It used scope of services. And if you look at the dictionary definition of scope of services, that's broad. It could mean one of two things, and I think the state acknowledges it could mean. Extent of something or amount or duration of something. Hold on. No, amount or duration. Wait, wait. I said amount of duration. Excuse me. Extent of something or range of operations. I misspoke. So talk to me about amount and duration because I think, frankly, this is one of the state's strongest points, that Congress has demonstrated an ability to differentiate scope from amount and duration time and time and time and time and time again. I think they take that too far. As our position, and I'll admit there's been some evolution as we've educated ourselves during the scope of this case. The scope? During the scope of this, yes. During the case, during the course of the case. As we interacted with the district court and understand where the district court was coming from, both of them denying their motion to dismiss and granting our motion for summary judgment. The issue here, as we understand it, is not so much whether type, duration, amount, and intensity, the factors set forth in the CMS guidance, are the sole factors, are the limiting factors, are the extent of the factors that need to be looked at. Rather, the question is what's the statute say? It says scope of services. What's the plain meaning of scope of services? The plain meaning of scope, again, is the extent or range of something. If I have, as this provider did, as FHC did, 13 sites in 1999 and 2000, and now I have 41, well, that's a common sense change in the extent of my services. It's a common sense plain meaning change in the range of my operations. And to the extent I can demonstrate that my costs went up beyond the rate of inflation necessarily because I did that, I'm entitled to an adjustment under the statute because that's a plain meaning change of scope. I'm not hamstrung with amount and duration. I think that's a red herring going into the amount, and I understand their argument. Yeah, Congress used amount and duration many times throughout the statute. Adjacent to scope, they didn't use it here. I understand the argument, but I think it's a red herring argument. I think you have to start and stop with what the scope of services is. But from that premise, do you think you need to concede that whatever scope means, it means something different from amount and duration, and thus any reimbursement request that in truth, whether those are kind of magic words or not, but whether in substance is an amount request or a duration request is not covered? Not quite. Okay. If we were just asking, again, for an increase in our rate because we have more services, I mean more visits of the same type, I agree we shouldn't get it. Because that's the obvious double dip at factor one. And it's also an amount. That's the kind of amount thing that I think we shouldn't get. But if we have a change in the amount of services within each visit, and I could use a different term, but I'll use amount, because our patient population has changed. We have more diabetic patients that require more intensive services than ever. And we can demonstrate that. That amount seems to me is squarely within the common sense definition and the plain meaning definition of scope of services. So I don't think the inclusion or using amount and duration in other places within the Medicaid statute and not here means it's still not under appropriate circumstances within the concept of scope of services. I don't think the fact that it's used elsewhere carves it out of scope where it's appropriately part of the extent of something or the range of our operations. Can you help me with my failure to understand what intensity means? And I recognize that I'm not trying to foist upon you the language from the guidance document that you guys initially sort of framed your argument. I take it's fine that sort of your thinking about it has evolved. But those words do fairly represent sort of like buckets of things. They just help me to organize in my own mind. And so I think amount and duration, I've kind of got my head around. What is intensity? Intensity is generally thought of in healthcare as the amount of things you do for a particular instance of care. At least that's how I understand it. So I have a patient who comes in. What am I doing in this visit? How many things do I have to do for this patient? Because we're being paid on a per visit basis. How long does a doctor stay with the patient? Do I have a nurse practitioner? Do I give diagnostic services to this patient during this visit? All of those things go into the intensity of the service. So that, again, to me speaks to acuity, increases in acuity, require more services per visit. I'm not going to use the word amount. And may require longer visits. And those types of things, in my view, are represented by intensity, but more importantly are broadly represented in the definition of scope of services. So I go to the extent or range of what I'm doing. And let me give you another example if I might. Is it sort of like thoroughness? I mean, like sometimes you can do a very thorough examination with just basic, you know, just the doctor goes in and knows immediately what the problem is. But sometimes thoroughness requires a battery of tests or whatever. Is it something like that maybe? That's an example. And it's reflective of changes in patient population and changes in acuity. And we're treating sicker and sicker patients all the time. Let me give you another example as to why I think trying to narrowly place this amount and duration and consider that doesn't work in terms of thinking about what scope of services means. For family health centers in the base year, 1999-2000, we had one pediatric practice with, I believe, one or two pediatricians in one site. Well, now we have 11 pediatric practices with, I believe, 30-some-odd pediatricians. That, to me, is a common – and assuming that caused a cost increase beyond just the fact that we're doing more visits and beyond the inflation fact index, and we can demonstrate that, that, to me, is a common-sense notion of what a change in the extent or range of our services are. We went from two pediatricians to 30 pediatricians. We went from one place that kids could get services to 13 or so places, or I think 10 or 11 places, I don't want to misspeak, that kids could get services. That's a common-sense change in the range of operations, and their definition of the addition of a brand-new service doesn't allow us to get paid for that because we had that service in place at one place, one time, way back in 1999-2000. So that's why their definition is too narrow. Scope of services is a broad term, again, that Congress intended to be this safety valve so that this prospective payment system relieves hospitals of administrative burdens, addresses what you were saying, Judge Rosenbaum, in terms of retroactive recoveries, provides some prospectivity to it, but gives them the flexibility to enhance their services, enhance their outreach to these very needy patients, and still not be penalized for it and still receive adequate reimbursement. Is it true that there are two public policy issues perhaps in conflict here? On one end, you have a statute that's about making sure that lower-income individuals have access to medical care. That's kind of the work that your client does and is asking for more money to do that. On the other side, you have a state that in some ways is subsidizing this medical care and perhaps might run out of money because your client's services continue to increase, become more expensive, which the public policy goal of providing more medical care might be undermined because the state can't afford it. So number one, do you view those as competing public policy considerations? And if so, how do we reconcile that in our role of interpreting the statute to achieve Congress's purpose? Yes, there are always a conflict between wanting to provide broad ranges of governmentally paid-for services to cover more and more people and the impact on the state and federal affairs. No doubt about it. I will remind the court that most of these monies are federal monies. There's a little bit of – there's some state money. I don't remember what the – something like a 30-70 percentage. I'm not sure if that's exactly correct in Florida. If these patients are not able to receive services at family health centers because these rates are so low and we're getting paid about 60%, 65% of our costs right now, the patients will either not get care or they'll end up in hospital emergency rooms. That's more costly to the system. That's more costly to the state. So the public policy, both from a financial perspective and from a better way to treat patients perspective, is to have a family health centers and other FQHCs available to these patients to keep them healthy, to have them have primary care available so they have a place to go to get their teeth fixed. They have a place to go to get their primary care so they don't end up in a hospital. I think that sounds great, but I think what I hear Judge Abudu asking you is there's not a bottomless well of money here. And to the extent that you guys understandably sort of want more money to recoup your costs, great. More health care. Nobody's against more health care. But somebody's got to pay for it. And it seems to me that at least in some respects, if we're going to talk about sort of Congress's purpose, it's a purpose of moving off a reasonable cost method of reimbursement to something that is indexed to a number with more reticulated measures of increases that has to have been to control costs. Nothing in the record here, nothing in the legislative history that I found, and we researched the heck out of this, suggests that. It was to take the administrative burden off of the federally qualified health centers so that they would know predictably what they would get paid and would have to wait three years to figure out how much they would ultimately get paid and have these retroactive recoupments. But it was not designed to save money, unlike the hospital prospective payment system and some of the others, which are clearly designed in part to control costs. There's nothing showing the intention here. Rather, the intention was the opposite. It was to keep these FQHCs healthy so they wouldn't shut down. If this narrow view of a change in scope that the state's asserting is allowed to win the day, then we'll be in a situation where our center, federal family health centers, and others around the state are just simply going to not have enough money to stay open. And that's not hyperbole. It's the truth. And so that's not what Congress intended by including the safety valve of scope of services within the prospective payment statute that it enacted. Can I ask one more? Of course. Sort of stepping way back. I'm the one who dragged you down into the weeds of the statute, but now stepping way back. Tell me why I shouldn't understand your argument at its essence to be an argument to return to the old, discarded reimbursement method. It sounds like what you really want is to be reimbursed for your reasonable costs. Why not? It's not because we're not saying if nothing changed. We were the same family health centers today that we were in 2000, and our costs just went up faster than the Medicare economic index. We wouldn't have a position. We wouldn't have a scope of services adjustment. We have to show that there was a change in scope, meaning, again, a change in the extent or a change in the range of the services we provide. Once we show that, then we're entitled to an adjustment. Now, how that adjustment gets computed varies from state to state. Some states, if you can show a scope of services change, they'll rebase you completely. You get to start over, get your costs. Some states do what Florida does, which is show me your cost increase due to the change in scope. So what our position is, we've got to get our foot in the door. We have to have a change in scope. So we're not saying give us our cost, period. We're not saying return to reasonable cost reimbursement. We're saying if we show a change in scope, using, again, the dictionary definition of what those terms mean, give us the costs we can show we necessarily and reasonably incurred resulting from that change in scope. I guess the reason that I ask is that it's – I take your point that it's all sort of fundamentally about scope, and you've got to show scope. But under your definition of scope, basically everything is included, and so you get back to something that looks like the old model. At least that's the way it feels to me. I understand the thinking, Your Honor, but that's not where we're at. Again, to make it simple, if we had one site that provided adult services back in 2000, and today we have one site that provides adult services and the patient population hasn't changed very much, we have no argument, zero argument. It's only where things changed, and the changes have to be pretty fundamental to be a change in scope. Again, I would say moving from 13 practice locations to 41, spreading your ambit out to more populations, that's a common sense – to me that's an extent. But wouldn't much more marginal increases also – I mean it says any increase or decrease, right? So it doesn't have to be 13 to 41. It could be 13 to 13.1, one extra doctor, one extra nurse, whatever, right? I mean I think under your interpretation, those sorts of things, very marginal increases would qualify. Your point is well taken, Your Honor, because it does say any. I can't disagree with you. The only thing I would say is that a center would not seek an increase for something at the margins because it's just not worth it, right? But I understand you from a textual standpoint. I can't say that you're wrong. Okay, that's helpful. Thank you. All right, thank you very much, Mr. Bookman, and we'll hear again from Mr. Baum. Three quick points. First, I want to address this addition of centers argument. If they have new centers, well, that's asking for an increase in the reimbursement for the amount of visits because you have a new center, you're going to have more visits, but those are already accounted for by the concept of amount and the concept of the new visits. Now, there was also the hypothetical of, well, we had one center that had pediatric services and the other seven didn't, and now they all do. But back then, their reimbursement included pediatric services if you walked into any one of those centers. So they were already compensated for the pediatric services when they walked into a center without those services. So expanding to the rest of them would be, and to give them a reimbursement based on that, would be to double dip. So I want to ask you about something that Judge Newsom asked you about, at least I understand and to have asked you about, when you first got up. And that is, you know, optometry, for example, right? If that's new, they haven't offered optometry before, that is an increase in the scope. I think that's an example you all give. But what if it's like, you know, they have new equipment that offers new tests that are more expansive. Is that considered an increase in the scope in your view of the definition of scope? So new equipment, no, because new equipment is That offers new kinds of tests, diagnostic tools, is more thorough, more advanced. Equipment, no, because that's expressly accounted for in the changes to the Medicare Economic Index. Now, as I mentioned, there could potentially be a dispute in some future case about what ACCA's definition of services Well, let me stop you for a second, though. The example that comes to my mind is there are plenty of pediatric offices that where, you know, take a kid in who has a high fever. They look at the kid. They examine the kid and they say, you know, looks looks like he has a virus or whatever. And that's that. But there are some pediatric offices you go to and they'll do that. But then they'll also take a little thing of blood and they'll run it through their machine to see whether the machine. What the what the white blood cell count is to see if there's an infection, how bad the infection is, whether it's something that an antibiotic is required for, et cetera, or whether the kid even needs to be in the hospital. And so the the intensity or the thoroughness of that visit. I mean, in some cases, it might certainly suffice that that the blood sample is not taken and a doctor can certainly adequately diagnose the situation. But in other circumstances, you might need that information. If you go to a practice that doesn't have that available, that practice is getting paid the same amount as the practice that does have that available under what you're saying. Let's say that the practice that doesn't have that available then purchases that machine so it can provide that new service. You're saying that's already covered in the MEI adjustment. Well, I'm also saying that that could potentially be a change in a particular or the addition or subtraction of a new service. But how do we decide? I mean, because it matters. Right. I mean, if you're saying it's covered by MEI, that means that there's no further consideration of that. If you're saying that it could be a new service, then you're saying that it's covered but it's going to be covered in a way that they're going to receive an increase in payment. Well, I think you have to go and look to their complaint. That's not what they're asking for. They're not saying we've added this additional- Okay. We are making a rule here that is going to apply to everyone. So if we are defining what the term scope means, we need to know what the term scope means. And whether it might turn out – I mean, maybe one of you is right, or it might turn out scope means something in between what you're both saying. I don't know. But that's why I'm asking the question. Of course, Your Honor. And a lot of that is encompassed within the term intensity, as Your Honor has focused on. That word is simply not in the statute. And as plaintiffs have already said, they have said, well, if we demonstrate that our reasonable costs have changed, well, we should be able to get an increase in the reimbursement for that. But as Your Honor mentioned, that's the old system. You cannot calculate the changes that Your Honor is talking about in terms of changes to this intensity, changes to a particular – how intense a particular service is without calculating a change to their reasonable cost. And Congress said we're not doing that anymore. And so – But, I mean, maybe when Congress said that we look at changes – increases and decreases in the scope, they were talking about the kind of example I've just given. Maybe they weren't. Maybe they thought that fell into MEI. I don't know. I'm just trying to get your best argument for where you think that falls and why. Sure. And I think that you can look at the inputs that go into the MEI, and you can look at new equipment changes and cost to equipment. And that all comes out, and increases for that would be double-dipping. Now, to the extent that there are other increases that you would characterize as intensity, again, we don't think those are covered either for the reasons that I've discussed. There could, on the margins, for some future case, be a dispute about whether something is a new type of service.